UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| **HALEY DECK** | : | **CASE NO.** 3:12-cv-63 |
| 2594 Morning Sun Drive | | |
| Beavercreek, Ohio 45431 | : | **JUDGE:** Black |
| | | |
| **and** | : | |
| | | |
| **GEVENA MILBRY** | : | **CLASS ACTION COMPLAINT** |
| 4070 Buckleigh Way | | **FOR DAMAGES, EQUITABLE RELIEF** |
| Trotwood, Ohio 45426 | : | **AND DECLARATORY JUDGMENT** |
| | | **WITH JURY DEMAND** |
| **and** | : | |
| | | |
| **DUSTIN YOUNG** | : | |
| 1622 Leo Street | | |
| Dayton, Ohio 45404 | : | |
| | | |
| **and** | : | |
| | | |
| **DANIELLE BARNETT** | : | |
| 5526 Hartley Court | | |
| Huber Heights, Ohio 45424 | : | |
| | | |
| **and** | : | |
| | | |
| **SAMANTHA BRUMLEY** | : | |
| 231 Carlwood Drive | | |
| Miamisburg, Ohio 45342 | : | |
| | | |
| **and** | : | |
| | | |
| **KATHERINE CHAMBERS** | : | |
| 1631 N. Limestone Street | | |
| Springfield, Ohio 45503 | : | |

G R E E N
G R E E N
L A W Y E R S
&

and                                         :

TIERRA HAMERTER                             :
516 Euclid Avenue
Dayton, Ohio 45402                          :

and                                         :

RUBY BERRY                                  :
3658 Yellowstone Avenue
Dayton, Ohio 45416                          :

and                                         :

RHONDA ROBINSON MARTIN                      :
7606 Remmick Lane
Huber Heights, Ohio 45424                   :

and                                         :

AMANDA MILLER-WILSON                        :
6895 Manor Crest Ln
Canal Winchester, Ohio 43110                :

and                                         :

SHAMEKIA GOODWIN                            :
3216 Riverside Avenue
Cleveland, Ohio 44109                       :

and                                         :

UNITED STATES ex rel. Brumley,              :
Deck and Milbry,
                                            :
        Plaintiffs, individually,
        and on behalf of all                :
        those similarly situated,

2

G R E E N
&
G R E E N
L A W Y E R S

v.                                          :

THE MIAMI-JACOBS BUSINESS              :
   COLLEGE COMPANY
110 N. Patterson Blvd.                  :
Dayton, Ohio 45402

                                        :

and                                     

                                        :

DELTA CAREER EDUCATION
   CORPORATION                          :
(f.k.a. Gryphon Colleges Corporation)
4525 Columbus Street, Suite 101         :
Virginia Beach, Virginia 23462-6701

                                        :

Also serve registered agent
National Registered Agents, Inc.        :
4001 N. Ninth Street, Suite 227
Arlington, Virginia 22203               :

and                                     :

DELTA EDUCATIONAL SYSTEMS, INC. :
4525 Columbus Street, Suite 101
Virginia Beach, Virginia 23462-6701     :

Also serve registered agent:            :
G.W. Birkhead
101 W. Main Street                      :
500 World Trade Center
Norfolk, Virginia 23510                 :

and                                     :

3



GRYPHON INVESTORS, INC.      :
c/o R. David Andrews, Agent
One Market Plaza      :
Steuart Tower, 24th Floor
San Francisco, California 94105,      :

      Defendants.      :

---

Plaintiffs,, **Haley Deck, Gevena Milbry, Dustin Young, Danielle Barnett, Samantha Brumley, Katherine Chambers, Tierra Hamerter, Rhonda Martin, Ruby Berry, Amanda Miller-Wilson, Shamekia Goodwin, and United States of America, ex rel. Brumley, Deck and Milbry** on behalf of themselves individually, on behalf of the class(es) of all persons similarly situated, and on behalf of the United States government and its taxpayers, ("plaintiffs" hereafter)[1] for their complaint against the defendants, Miami-Jacobs Business College Company dba Miami-Jacobs Career College, Delta Career Education Corporation, Delta Educational Systems, Inc. and Gryphon Investors, state as follows:

## I. Parties, Jurisdiction, and Venue

1. The individual and class representative plaintiffs are citizens of the State of Ohio.

2. The individual, class representative, and class member plaintiffs are currently or

formerly enrolled students at the Ohio campuses of The Miami-Jacobs Business

College Company doing business as Miami-Jacobs Career College ("the School"),

and who are seeking or have sought education, instruction, training, skills, and

experience to earn Associate degrees and obtain Licenses and/or Certifications in

certain courses of study offered by Miami-Jacobs and described as "Allied Health

---

[1] Any reference to "plaintiffs" hereafter is expressly intended to include all plaintiffs, both individuals in their individual and representative capacities and all class and sub-class members, as well as the Government, unless otherwise specified.

4



G R E E N
&
G R E E N
L A W Y E R S

Programs" specifically "Surgical Technology," "Practical Nursing," "Respiratory Therapy," and "Medical Laboratory Technology."

3.    All transactions between plaintiffs and defendants subject of this action occurred in the State of Ohio, and all but one of the individual plaintiffs, as further described below, reside in the Southern District of Ohio.

4.    Plaintiffs bring this action on behalf of the taxpayers and the United States government pursuant to the False Claims Act, 31 U.S.C. §§3729-3731.

5.    Plaintiffs further assert claims pursuant to the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§1961-1969.

6.    The Miami-Jacobs Business College Company is an Ohio for-profit corporation that is owned, controlled, and operated as a wholly-owned subsidiary of Delta Educational Systems, Inc., a Virginia for-profit corporation, which is in turn owned, controlled, and operated as a wholly–owned subsidiary of defendant, Delta Career Education Corporation, a Delaware for-profit corporation having its principal office in Virginia (together "Delta").

7.    Delta is not qualified or authorized to transact business in Ohio. It holds itself out as, and transacts business in Ohio under the unregistered fictitious name, "Miami-Jacobs Career College ".

5



8.    Miami-Jacobs Business College Company, Delta, and "Miami-Jacobs Career College" are operated by employees and agents of, and are compensated by, the same entity, all of whom unless expressly otherwise described, are referred to hereafter as "Miami-Jacobs" or "the School."

9.    Miami-Jacobs regularly conducts business at campuses in Dayton, Springboro, Troy, Columbus, Sharonville, and Cleveland, in the Ohio counties of Montgomery, Warren, Miami, Franklin, Hamilton, and Cuyahoga, Ohio, respectively. With the exception of Cleveland, all campuses are in the Southern District of Ohio.

10.   Delta owns and operates for-profit facilities characterized as "career schools" throughout the United States, including Miami-Jacobs, Miller-Motte Technical College, Career Technical College, The Creative Circus, and McCann School of Business & Technology.

11.   Upon information and belief, Delta is owned by defendant, Gryphon Investors, Inc. a California for-profit corporation whose charter is suspended.

12.   This court has original jurisdiction over this action pursuant to 28 U.S.C. 1331 and/or 28 U.S.C. 1332(d).

13.   Venue exists pursuant to 28 U.S.C. 1391(a) and/or (b).

14.   The amount in controversy exceeds $4,000,000, exclusive of interest or costs.



## II. Class Action Allegations

15.   Plaintiffs incorporate the foregoing as if fully rewritten.

16.   Plaintiffs bring this class action pursuant to Civil Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated, with the class being defined as follows, of which they are members, and whom they seek to represent:

> All persons who since 2004 enrolled in, paid tuition for, and were students in Miami-Jacobs' Allied Health Programs.

17.   Plaintiffs request that this court certify a first sub-class defined as:

> All persons who since 2004 enrolled in, paid tuition for, and were students in Miami-Jacobs' Allied Health Programs who did not graduate from the program.

18.   Members of the first sub-class are necessarily members of the class defined in paragraph 16. Tierra Hamerter is a member of the first subclass she seeks to represent.

19.   Plaintiffs request that this court certify a second sub-class defined as:

> All persons who since 2004 enrolled in, paid tuition for, and were students in Miami-Jacobs' Allied Health Programs who were terminated, expelled, suspended, or involuntarily withdrawn from their program by Miami-Jacobs based upon inconsistent, arbitrary, or unsupported academic and/or disciplinary policies by its administrators and/or instructors.

7



GREEN
&
GREEN
LAWYERS

20.     Members of the second sub-class are necessarily members of the class defined in paragraph 16 above.  Katherine Chambers and Gevena Milbry are members of the second subclass they seek to represent.

21.     The putative class members for and on whose behalf plaintiffs bring this action are known to number at least 200 and are estimated to exceed 500 persons, all of whom have sustained damages as the direct and proximate result of defendants' action as described herein.

22.     The name and address of each putative class member is readily discoverable from defendants through Miami-Jacobs' enrollment, admission, and/or financial aid records. The putative class members are so numerous and geographically dispersed that their joinder is impractical.

23.     The representative plaintiffs and putative class and sub–class members all have claims that are typical and similar among themselves, in that they arise as the direct and proximate result of fraud, deception, breach of contract, and violation of statutes perpetrated by defendants as described herein.

24.     Questions of law and fact are common among the plaintiffs and putative class and sub–class members, and predominate over questions involving individual members. making a class action a superior means and method for the fair and efficient adjudication of this controversy.

8



25. The representative plaintiffs and putative class and sub-class members have each paid substantial tuition, incurred significant debt, foregone opportunities, and lost wages or earning capacity in order to pursue and obtain what was falsely represented as accredited, complete, sufficient, respected, and marketable degrees, certifications, education, and/or careers by Miami-Jacobs. Each claims to have been similarly damaged as a result.

26. The representative plaintiffs will fairly and adequately assert and protect the interests of the putative class and sub–classes.

27. The maintenance of this action as a class action will be superior to other available methods of adjudication and in promoting the convenient administration of justice.

28. This action is properly maintained as a class action under Civ. R. 23(b) because:

    (A)   The prosecution of separate actions by each person identified as a putative member of the class and/or sub-class creates or would create a risk of:

        (1)    inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for defendants; and

        (2)    adjudication with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

    (B)   Defendants have acted and refused to act on grounds generally applicable to the putative class and/or sub-class, thereby making

9



appropriate final injunctive relief or corresponding declaratory relief with respect to the class and/or sub-classes as a whole;

(C)  The court will find that questions of law and fact common to the putative class and/or sub–class members predominate over any questions affecting only individual members, such that proceeding as a class action is superior to other available methods for the fair and efficient adjudication of this controversy;

(D)  The class and sub-classes are readily definable; and

(E)  Defendants have misrepresented and/or concealed from the individual class and sub-class members their rights and remedies such that they have been misled and made unaware of their rights and remedies which plaintiffs are prepared and able to prosecute on their behalf.

29.  There are no difficulties known or anticipated that would interfere with the court's efficient management of this action as a class action.

30.  Absent a class action, class and sub–class members will continue to suffer losses.

### III. General Factual Allegations

31.  Plaintiffs incorporate the foregoing as if fully rewritten.

### A. Financial Aid

32.  Tuition at Miami-Jacobs is substantial. Tuition cost for the 96 credit hour Surgical Technology program is not less than $24,000; tuition cost for the 72 credit hour Practical Nursing program is not less than $22,000;[2] tuition cost for the 96 credit

---

[2] The Practical Nursing program has lost its accreditation by the State of Ohio Board of Nursing, which decision is on remand following appeal; upon information and belief, that program has not accepted new enrollments since mid–2010.

10



hour Respiratory Therapy program was $30,000 or more;[3] and upon information and belief, the cost for the Medical Laboratory Technician program exceeds $20,000.

33. The average credit hour cost for the Allied Health Programs since 2004 is between $250.00 and $375.00. By comparison, the community college in Dayton, Sinclair Community College, offers the same programs and degrees and currently charges Montgomery county residents $51.20 per credit hour; out–of–county residents, $82.70 per credit hour, and non–Ohio students, $160.20 per credit hour.[4]

34. The most recent data published by U.S. Department of Education reports that between 83% and100% of first-time, first-year students and, 70% to 84% of all students enrolled at all Miami-Jacobs Career College campuses receive student aid (based on 2008 data).

35. The same reports estimate 93% or more of such aid constitutes federal funds or federally subsidized student loan money, commonly referred to as "Title IV" funding, that Miami-Jacobs arranges for its students to borrow. Upon information and belief, Miami-Jacobs receives 90% or more of its revenue from Title IV funding.[5]

---

[3] The Respiratory Therapy program lost or halted its pursuit of accreditation September 2010 and is also understood not to have accepted any more students since early to mid- 2010.

[4] According to Sinclair's online tuition information for 2011.

[5] Title IV student aid is governed and made available pursuant to the Higher Education Act, as modified and reenacted in 1992 (see, e.g., 20 U.S.C. §§ 1071, 1077,

11



G R E E N
G R E E N
L A W Y E R S

36.  Plaintiffs were awarded financial aid, including Title IV loans, for their attendance at Miami-Jacobs and are obligated to pay back those loans.

37.  Employees and agents of Miami-Jacobs control the application process for financial aid requested by students, including plaintiffs.

38.  According to data published by the U.S. Department of Education, in fiscal year 2006, more than 21% of Miami-Jacobs students in a repayment period on their student loans defaulted on those loans; in FY2007 that default rate was over 20%, and for FY2008, the most recent period for which there is data, the cohort default rate was still 11.7%. The national average for the student loan default rates for all post-secondary schools was 7%; the average for schools in Ohio was 6.1%.

39.  Abuses of federal (direct or subsidized) financial aid, by proprietary, post-secondary institutions is a known concern of the federal government and has been the subject of investigation by the federal government in recent years.[6]

40.  In order to obtain the maximum amount of funds per student, Miami-Jacobs knowingly, intentionally, and deliberately submits false and deceptive information to the federal government when applying for federal direct and/or federally

---

1078) and the associated federal regulations.

[6] For example, see, Testimony of Gregory D. Katz, Managing Director, Forensic Audits and Special Investigations, General Accountability Office, before the Senate Committee on Health, Education, Labor and Pensions, April, 2010, available at http://www.gao.gov/new.items/d10948t.pdf.

12


G  R  E  E  N
&
G  R  E  E  N
L  A  W  Y  E  R  S

subsidized student financial aid on behalf of students, including plaintiffs, with the intent of obtaining financial gain which it would otherwise not obtain. See, 34 C.F.R. §668.71.

41.  Specifically, Miami-Jacobs reports charges or purported estimates for "room and board", "transportation", and "personal" costs, among other data, to the federal government on applications for financial aid, notwithstanding that Miami–Jacobs does not charge for such items, and no factual data substantiating such are obtained from students. This is done regularly without a student's knowledge. Monies loaned by financial aid providers based on this false information is paid to Miami–Jacobs and added to the student-borrower's debt. See, 34 C.F.R. 668.24.

42.  Also, to continue participating in federal Title IV programs, upon information and belief, Miami-Jacobs falsely certifies to the government that it is in compliance with its Program Participation Agreement ("PPA") and/or related federal statutes and regulations. See, 34 C.F.R. §§668.71; 668.72.

43.  In particular, Miami-Jacobs has falsely certified compliance with requirements related to substantiating its advertising and marketing representations, especially related to its job placement and opportunities for students and the ready and timely availability of clinical training. See, 34 C.F.R. §§668.14(b)(10)(i); 668.72; 668.74.

13



44. Further, defendants have falsely certified that its programs properly and adequately prepare students for gainful employment in their specified fields, knowing it to be untrue. See, 34 C.F.R. §§668.15(b)(26); 668.15(b)(1); 668.72.

45. These misrepresentations were made with the knowledge and intent that the federal government rely upon them, the government has relied upon them, and defendants have received Title IV monies as a direct result, in part, of these misrepresentations.

46. Because Miami-Jacobs graduates, including plaintiffs, are unable to obtain the employment they were lead to reasonably expect at a wage they were lead to reasonably expect, they are often unable to pay or keep up with payments on their student loans which are often fraudulently inflated, or obtain different schooling or credentials.

47. Defendants' fraudulent conduct from 2004 to the present with respect to federal financial aid applications has likewise caused damage to the United States government and its taxpayers by the false inflation of student need giving rise to loans of large sums of federal financial aid to Miami-Jacobs' Allied Health Program students, including a large number of loans that stand a significant chance of default due to the recipient's inability to obtain employment in their career field or other employment adequate to repay the heavy and often inflated loan debt.

14

48.     When default occurs on the student loans, the student's credit is damaged and the risks and costs of non-payment are borne by the federal government and its taxpayers.[7]

49.     Also, defendants maintain control and possession of all student aid monies obtained from lenders and grant providers. Defendants release monies in excess of the stated tuition to students only on request and as determined in the School's sole discretion.

50.     Upon information and belief, this process is designed to benefit defendants by their retention of student loan monies in excess of the student's tuition, interest on those monies, and to conceal their fraudulent conduct. As a part of this concealment, defendants refuse to produce to, and instead conceal from, plaintiffs copies of their own student files, loan applications, and financial aid records.

51.     Further, in some instances, when defendants represented they were "sending excess [loan] money back" to the lenders because it was not needed to pay tuition then due, it was in fact not reimbursed or returned to, nor received by, the lender, even though the student(s)/plaintiff(s)did not possess it or receive any benefit from it and were required to pay it back as a part of their student loans. This was a further deceptive and fraudulent practice by the school against plaintiffs and the federal government. See, 34 C.F.R. §§668.14(b)(25); 668.15(b)(3)(i).

_____

[7] See Testimony of George D. Katz, supra.

15



G   R   E   E   N
G   R   E   E   N
L   A   W   Y   E   R   S

## B. Deceptive and Misleading Marketing and Representations

52.    From at least 2004 to the present, defendants have deceptively marketed Miami-Jacobs as a small, local college in the Dayton, Ohio area with a "146-year [or more] history". In fact, after Gryphon/Delta purchased Miami-Jacobs in 2003, it became a large, for-profit business and effectively a new school.

53.    Soon after Delta's acquisition of Miami-Jacobs, defendants began an aggressive campaign to start the subject Allied Health Programs and recruit new students and, over time, expanded to multiple campuses.

54.    Defendants have represented at all relevant times through their advertisements and marketing that the Allied Health Programs at Miami-Jacobs will enable students to begin school immediately, start working sooner, obtain a well-paying and high-demand career, and achieve certification through the certifying boards in their educational specialty. Defendants knew the same programs offered by other local community colleges have at least a two year wait list for students to enroll.

55.    In fact, Miami-Jacobs is and was aware when the representations were made, that even plaintiffs who performed successfully in school, maintained good grades, performed well in clinical assignments, and graduated from the Allied Health Programs, and, in some instances, even passed certification examinations, have been

16



unable to obtain, or endured significant delay and difficulty, obtaining employment in their degree field or related fields.

56. From at least 2004 to the present, defendants have represented Miami-Jacobs as being properly equipped, staffed, accredited, and prepared to adequately educate and train students in Allied Health Program career fields for employment within their field of study and for the related certification examinations.

57. Miami-Jacobs' Allied Health Program faculty and administrators are represented as fully and properly credentialed as required by applicable statute, regulation, and standards, that the classes were being taught by properly credentialed instructors, and that the Allied Health Programs were being operated consistent with state requirements.

58. In fact, the Allied Health Programs from their inception have been inadequately staffed, equipped, and administered. Allied Health Program classes have had multiple changes of instructors within the same term, lacked instructors, have inadequate, uncredentialed, or unprepared instructors, fail to use materials students are required to purchase, or require students to purchase additional materials, have outdated or insufficient medical tools, equipment or supplies, have instructors unqualified to teach the classes to which they are assigned, instructors who falsify attendance records or instruct students to lie, and instructors and administrators

17



who arbitrarily enforce so-called school policies, among other deficiencies. Instructors who were properly qualified and made reasonable attempts to educate students were often terminated by Miami-Jacobs and/or Delta, or quit.

59.     Further, Miami-Jacobs has misrepresented or failed to disclose pertinent information to students about their classes and has changed curriculum and testing requirements for students during a term from what was originally represented, such that failure to pass tests for which they had no or insufficient preparation resulted in students having to retake classes or be terminated from the Allied Health Program.

60.     The fact the faculty, administration, training, and education provided by Miami-Jacobs is substandard and in some cases violates applicable state statute and/or regulation is a fact known to Miami-Jacobs but is not reasonably discoverable by students, including plaintiffs, until they are so far into their Allied Health Program they are induced to remain enrolled.

61.     Defendants have represented to all those enrolled in the Allied Health Programs including plaintiffs that they had adequate clinical sites and "slots" for timely attendance and completion of required clinical course work.

62.     In fact, defendants knew that Miami-Jacobs did not have sufficient sites or slots for the Allied Health Program students needing to participate in clinical study in a timely manner, thereby causing delays of uncertain and undetermined lengths, in

18

some instances delaying graduation dates or causing students to lose employment outside of school.  Defendants continued enrolling students in the Allied Health Programs despite, and concealing this knowledge, to the students' detriment.

63.     Plaintiffs were required to wait weeks or months beyond the timely and scheduled beginning date for their clinical rotations for a site or slot, were required to travel distances up to and exceeding one hundred fifty miles per clinical day for lack of available local sites, some were directed to travel to other states to obtain clinical hours, were told to arrange for their own clinical site or slot, were provided or allowed only the minimum or less than the minimum number of hours or procedures needed with any deficit falsified by the school to reflect that the minimum numbers had been met, were provided insufficient types of procedures, and were subjected to inconsistently applied school policies with respect to attendance, participation, grading and/or discipline.

64.     Defendants have falsely represented, expressly and by implication, or omission amounting to fraudulent concealment, that its Allied Health Programs were and/or are fully accredited so as to allow and prepare plaintiffs in the Allied Health Programs to obtain career-specific certifications from appropriate certifying institutions which are required, recommended, or needed as a practical matter to work with potential allied health employers.

19



65.    Defendants' misrepresentations and concealment regarding the School's program accreditation status were material, have been made to plaintiffs since 2004 when those programs did not have full accreditation, with intent to cause plaintiffs to rely thereon, which they did to their detriment.

66.    From at least 2004 to the present, defendants have marketed Miami-Jacobs as having a respected reputation with and among local and regional allied health employers such that having a degree from Miami-Jacobs would assist a graduate in finding employment in his or her chosen career field.

67.    In fact, healthcare employers have told Miami-Jacobs allied health students, as well as the media, that they did not consider Miami-Jacobs students adequately trained or sufficiently educated to provide either clinical instruction and/or post-graduation employment to them.  Employers have refused to interview, let alone hire, Miami-Jacobs graduates for open positions because of this reputation.  Miami-Jacobs is and has been aware of these facts at all relevant times and has concealed and actively misrepresented this information.  Miami-Jacobs has punished students for speaking to employers or other students about these facts in furtherance of its concealment.

68.    Miami-Jacobs uses widespread marketing efforts through newspaper, television, and radio media, uses the internet and its own website, and maintains listings in printed telephone directories for marketing, promotion, and student recruiting.

20



GREEN
GREEN
L A W Y E R S

69.     Miami-Jacobs also solicits graduating high school students by regular United States mail for prospective enrollment, and communicates with applicants by telephone to solicit and induce them to apply to or enroll in the School. Further, Miami-Jacobs does or has offered compensation or rewards to students who refer others to the School for enrollment.

70.     The defendants' fraudulent and deceptive conduct from 2004 to the present with regard to the marketing and representations made about the Allied Health Programs has induced many hundreds of students to enroll, including plaintiffs.

71.     The United States Government Accountability Office has concluded that similar, if not nearly identical conduct and representations by proprietary post-secondary institutions, is deceptive and fraudulent.[8]

## C. Deceptive Sales Practices

72.     Defendants maintain internal statistics to track enrollments. Due to the financial importance to defendants of soliciting enrollments, admissions employees are rewarded if certain benchmarks are met and are financially rewarded if a student they enrolled graduates. Also, on information and belief, admissions employees are terminated if enrollment goals set by Defendants are not met.

---

[8] See, Katz Testimony, supra.

21

GREEN
&
GREEN
L A W Y E R S

73.     In order to maximize enrollments, from 2004 to the present, Miami-Jacobs admissions agents and/or employees have deceived prospective students, including plaintiffs, to "sell" the Allied Health Programs and to reasonably induce reliance on those false representations, pursuant to direction from defendants.

74.     These misrepresentations include some or all of those discussed in the paragraphs above and below, as well as others.

75.     These misrepresentations have been oral and written, have been by affirmative statements that imply the truth or existence of material facts or conditions that are untrue or nonexistent, have concealed matters where a duty to disclose existed, and have been made to induce plaintiffs' reliance to their detriment.

76.     These misrepresentations and intentional omissions by admissions personnel are known, directed, and/or scripted by defendants, and are published in the School's information and admissions material, website, orientation materials, course catalogs, student handbooks, enrollment contracts, and other documents and sources.

77.     Defendants have made these misrepresentations to applicants, including plaintiffs, during enrollment meetings and before they were provided a student handbook.

78.     Prospective students are not provided a copy of the Miami-Jacobs student handbook or catalog until after they have enrolled in the Allied Health Programs. Financial aid is not discussed either until after the student has enrolled.

22



79.   Defendants insist that all accepted applicants, including plaintiffs, sign a contract to enroll which is an adhesion contract not subject to negotiation and is not explained to the enrollee other than they are told to "initial all paragraphs and sign at the bottom."

80.   This enrollment contract contains a pre-printed arbitration provision that students are not aware of, do not understand, and that is not explained to them. The clause is unilateral and purports to waive individual student rights to jury trial and to require binding arbitration specifically the costly commercial process of the American Arbitration Association and occurring in specific locations.

81.   With regard to the enrollment contract, there is a significant disparity in the bargaining power between the corporate School and the uneducated, uninformed applicants, including plaintiffs, which is unreasonably favorable to the School.

82.   The arbitration provision in the enrollment contract is used to dissuade any later challenges to the school by the enormous and prohibitive cost, burden and oppression on the individual students.

83.   The arbitration clause is procedurally and substantively unconscionable.

84.   The arbitration clause does not reference class action proceedings and is inapplicable to class actions.

23



85.     Credits from Miami-Jacobs are so restricted against transferability that any graduate wishing to further their education or seek a more marketable degree, even in the same career field, must retake the entire curriculum for which they have already paid Miami-Jacobs, and despite Miami-Jacobs' misrepresentations to the contrary.

86.     The misrepresentations by defendants are made before, during, and after a student's enrollment to induce enrollment and continued participation in the programs.

**D. Known Lack of Employment Opportunities for Graduates**

87.     From at least 2004 to the present, Miami-Jacobs has repeatedly represented that surveys report a 90% or higher "placement rate" for its Allied Health Program graduates. Such representations have been published in interviews for television and newspaper and in admissions and orientation presentations to students and prospective students.

88.     Miami-Jacobs knows or has reason to know that this representation is misleading to reasonable consumers, is inaccurate and/or untrue. The true facts are concealed or otherwise withheld from students, including plaintiffs.

89.     In fact, the statistics for the Miami-Jacobs Allied Health Program graduates who obtain employment in their chosen degree/career field are much lower than 90% and are reasonably estimated at 30-50%.

24



G   R   E   E   N
G   R   E   E   N
L   A   W   Y   E   R   S

90.  Defendants maintain records of post-graduation employment which reveal the far lower percentages of actual post-graduation employment of Allied Health Program graduates in their career fields or related fields, than their so-called surveys.

91.  The placement statistics Miami-Jacobs represents to promote its Allied Health Programs are derived from limited responses voluntarily submitted by certain graduates. Such responses are not a true survey, and are intentionally deceptive when represented as constituting an accurate post-graduation employment statistic.

92.  Miami-Jacobs further misrepresents to applicants and students, including plaintiffs, that it has superior placement services for its graduates available for "a lifetime."

93.  Miami-Jacobs conceals from  applicants, potential applicants, students, and graduates that much of its "placement services" consists of directing graduates to internet job search websites available to the general public, and providing job leads in unrelated career fields, when it responds to student inquiries at all.

94.  Defendants conceal the fact that most graduates counted as "placed" by Miami-Jacobs actually had no assistance from Miami-Jacobs in obtaining employment. Miami-Jacobs knows that the term "placed" is misleading to a reasonable consumer, including prospective students.

95.  Defendants also conceal the fact that many of the graduates counted as "placed" by Miami-Jacobs, particularly in "related career fields", are still employed in the same

25



G  R  E  E  N
&
G  R  E  E  N
L  A  W  Y  E  R  S

jobs they had before attending Miami-Jacobs, which do not require any of the skills for which the student pursued and paid for an education from Miami-Jacobs.

96. Miami-Jacobs conceals from applicants, students, and graduates the actual percent of its Allied Health Program graduates who are employed in their degree career field and making a wage the School represents to be reasonably anticipated.

97. These "placement" misrepresentations are intentionally made to induce students, including plaintiffs, to enroll or remain enrolled, and thereby allow defendants to fraudulently collect Title IV money.

98. Notwithstanding their known inaccuracy, defendants fraudulently provide these statistics to institutional accrediting bodies, program accrediting agencies, and government authorities which rely on the information provided by the School and whose accreditation is necessary for the School to obtain student financial aid.

99. Miami-Jacobs also conceals the career certification test pass rates for its Allied Health Program graduates in order to induce students, including plaintiffs, to enroll. The pass rates for Miami-Jacobs graduates are below the career field average.

100. Notwithstanding knowledge that Miami-Jacobs Allied Health Program graduates will not reasonably be able to obtain employment in their career or related fields, and will have significant difficulty passing career-specific certification examinations, defendants continue to make these misrepresentations, including to plaintiffs.

26



## E. **A Pattern of Intimidation and Retribution**

101.    Defendants intimidate students to prevent them from questioning their misrepresentations and omissions by engaging in a pattern and practice of retaliation and retribution by selectively disciplining students who questioned faculty or administration, who attempted to discover true facts regarding their enrollment, financial aid, clinical participation, professional certification, or employment issues, and expressly threatened students that if they obtained an attorney or spoke with the media, they would be expelled from Miami-Jacobs.

102.    Some plaintiffs were wrongfully expelled or constructively compelled to withdraw from the Allied Health Program late in their enrollment by Miami-Jacobs. These students had otherwise performed well, paid their fees, and upheld their agreement before being expelled or constructively compelled to withdraw.

103.    In fact, Miami-Jacobs, through its Dayton Campus Director, Angela Martin, has expressly told students who have attempted to hold the School to its written appeal and/or grievance policies and procedures that "[it] can't be expected to follow those policies" and has refused to comply even though it has enforced the policies against the students.

104.    Miami-Jacobs, through its Columbus Campus Director, Erin Dorman, has also advised students attempting to utilize the School's appeal and/or grievance

27



G  R  E  E  N
G  R  E  E  N
L  A  W  Y  E  R  S

procedures to "go ahead and file an appeal, it will go through me anyway, so what's the point?"

105.    In response to student questions or claims that were brought to Miami-Jacobs, Miami-Jacobs has failed or refused to produce student files on request or in response to properly signed authorizations, has continued making misrepresentations to the plaintiffs, the government, and the general public, and has published defamatory remarks about those questioning their fraudulent practices, all in an effort to conceal their corrupt behavior while continuing to pursue and reap Title IV money.

## F. Delta's Involvement

106.    Delta aided, abetted, and/or directed the School's marketing and sales schemes as described above, and the School's submission of false and misleading information in compliance certification reports and student financial aid applications.

107.    Delta also aided, abetted, and/or directed development of deceptive advertising for the School's Allied Health Programs and provided funds for such advertising.

108.    Delta also aided, abetted, and/or directed development and monitoring of the School's enrollment goals and student financial aid applications, particularly in the Allied Health Programs, and assisted with or participated in employee training.

109.    Following Delta's acquisition of The Miami-Jacobs Business College Company, the Miami-Jacobs president and/or other senior administrators participated in regular

28



G   R   E   E   N
&
G   R   E   E   N
L   A   W   Y   E   R   S

meetings and conferences with Delta officers and administrators regarding the enrollment, operation, and profitability of the School.

110. Upon information and belief, Delta is the employer of the administrators and faculty at Miami-Jacobs and is indistinguishable with respect to the conduct and activities upon which plaintiffs base this action.

111. Delta represents and holds itself out as "doing business as Miami-Jacobs Career College", even though "Miami-Jacobs Career College" is a fictitious name that is not registered with the Ohio Secretary of State and Delta is not a foreign corporation authorized or licensed to transact business in Ohio.

112. Delta was aware that not later than 2008, seven former surgical technology students, six of whom had graduated and one who had not, were asserting claims against Miami-Jacobs for fraud, deception, violation of consumer protection laws, and breach of contract related to the School's misrepresentations made regarding the surgical technology program.

113. Notwithstanding, Delta and Miami-Jacobs continued to expand the pattern and practice of misrepresentation, deception, and fraud upon the government and the accrediting bodies, fraud and has continued to do so, despite notice of additional claims by other students.

G. **Defendants' Enterprise**



114. Since acquiring Miami-Jacobs, Gryphon and Delta have used Miami-Jacobs as a part of an enterprise and as instrumentality to further their fraud and corrupt practices.

115. Neither Gryphon nor Delta are separately authorized to do business in the State of Ohio and are not separately authorized to operate a proprietary school in the State of Ohio. However, through the use of Miami-Jacobs as a part of its enterprise, Gryphon and Delta are able to profit from the deceptive practices in place there.

116. After acquiring Miami-Jacobs, Delta officers and executives assumed control and management of Miami-Jacobs, including admissions/enrollment, financial aid, and placement. This includes the former president of Miami-Jacobs, Darlene Waite, and current Miami-Jacobs president, Ned Snyder.

117. Upon information and belief, after acquiring Miami-Jacobs, Delta established numerous policy changes and administrative mandates on the School, including but not limited to increased advertising, retraining of admissions employees, new programs, the relocation of financial operations to Delta's offices, and changing the reporting structure of Miami-Jacobs personnel to Delta officers. All material or significant policy changes at Miami-Jacobs since Delta's acquisition have been mandated by Delta.



GREEN
&
GREEN
LAWYERS

118.    Upon information and belief, Miami-Jacobs does not comply with corporate formalities under Ohio law such as annual shareholder meetings, financial reporting, or board of directors activities.

119.    Regular business meetings for Miami-Jacobs are conducted by Delta executives, who also prepare the agendas, by phone, internet, or other wire or electronic means or in person.

120.    Delta also controls the ultimate employment determinations related to instructors and administrators for Miami-Jacobs.

121.    At the same time as Delta has exercised control over Miami-Jacobs' officers, board, and day-to-day operations, it has fraudulently attempted to continue utilizing Miami-Jacobs' separate corporate existence to shield itself from liability and gain access to Title IV funding.

122.    Delta and Gryphon are engaged in an ongoing enterprise with, and are legally responsible for all the actions of, by, and through Miami-Jacobs alleged herein.

### IV. Legal Claims

### Count I - Violation of Ohio Consumer Sales Practices Act

123.    Plaintiffs incorporate the foregoing  as if fully rewritten.

31



124. Ohio Revised Code (R.C.) §1345.01 et seq. sets forth Ohio's Consumer Sales Practices Act ("CSPA") prohibiting unfair, deceptive, and unconscionable conduct in consumer sales transactions.

125. The CSPA is applicable to defendants' transactions and conduct with plaintiffs.

126. Defendants are "suppliers" as defined by R.C. §1345.01(C).

127. Plaintiffs are "consumers" as defined by R.C. §1345.01(D).

128. Plaintiffs' enrollment agreements and purchase of courses in Allied Health Programs sold or offered by defendants are "consumer transactions" as defined by R.C. §1345.01(A).

129. Defendants have committed unfair and deceptive acts against plaintiffs before, during, and/or after their School enrollment in violation of R.C. §1345.02 by deceptively representing orally or in written materials, or by omission of material facts:

    (a)    That the School education provided in the Allied Health Program had sponsorship, approval, uses, or benefits that it did not have;

    (b)    That the School education provided in the Allied Health Program was of a particular standard, quality, or grade, that it was not;

    (c)    That the School education provided in the Allied Health Program was supplied in accordance with a previous representation that it has not;

    (d)    That a specific tuition price advantage existed, when it did not;

32



G R E E N
&
G R E E N
L A W Y E R S

(e)     That the School education provided in the Allied Health Program had a sponsorship, approval, or affiliation that it did not;

(f)     That the School education provided in the Allied Health Program involved rights, remedies, or obligations that it did not.

130.    Defendants have committed unconscionable acts against plaintiffs before, during, and/or after their School enrollment in violation of R.C. §1345.03 by:

(a)     Knowingly taking advantage of the inability of the plaintiffs reasonably to protect his/her interests because of his/her ignorance, or inability to understand the language of an agreement;

(b)     Charging a tuition price that was substantially in excess of the price at which similar education, programs, and services were readily obtainable in similar consumer transactions by like student consumers at the time plaintiffs enrolled and entered a consumer transaction with the School;

(c)     Knowing at the time plaintiffs enrolled in the School thereby entering a consumer transaction with defendants, that they would be unable to receive a substantial benefit from their transaction;

(d)     Knowing at the time the plaintiffs enrolled in the School thereby entering a consumer transactions with defendants, that there was no reasonable probability of payment of the plaintiffs' obligations in full to the School or to their student aid lenders as the case may be;

(e)     Requiring plaintiffs to enter into enrollment agreements with the School on terms defendants knew were substantially one-sided in favor of the School; and,

(f)     Knowingly making numerous misleading statements of opinion on which the plaintiffs were likely to rely to his/her detriment.

33



131. Plaintiffs chose to attend Miami-Jacobs due to the omission of material facts and/or in reasonable reliance on various deceptive representations made by the defendants.

132. Plaintiffs were directly and proximately harmed by defendants' unfair, deceptive, and unconscionable acts and violations of the CSPA, and are entitled to compensatory and treble damages, attorney fees, and additional relief.

133. Defendants' unfair, deceptive, and unconscionable acts are ongoing, are part of a continuing pattern and practice of behavior, and are part of a single, established, deceptive scheme of operation.

134. Unfair, deceptive, and unconscionable acts such as committed by defendants against plaintiffs have previously been declared unfair, deceptive, and/or unconscionable by administrative rule and/or decisions of the courts of the State of Ohio, entitling plaintiffs and class members to recover treble damages as individuals or class action damages as specified in R.C. §1345.09.

135. Plaintiffs are also entitled to a declaration that defendants' acts constitute violations of R.C. Chapter 1345 and injunctions to preclude and prohibit further violations by defendants.

136. As a consequence of defendants' knowing violations and pursuant to R.C. §1345.09, plaintiffs are entitled to recover their attorney fees and costs.

34



137. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because they are each part of the scheme or enterprise operating Miami-Jacobs, including participation and direction of its unfair and unconscionable practices and sharing in the resulting profits.

138. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation, ownership, and responsibility with Delta and Gryphon that its separate status as a corporation has ceased to exist.

## Count II - Fraud

139. Plaintiffs incorporate the foregoing as if fully rewritten.

140. Defendants intentionally and purposefully made false representations or omissions material to plaintiffs, orally and in writing, intending for and inducing plaintiffs to rely on those false representations or omissions, including but not limited to those set forth in this complaint.

141. Plaintiffs did reasonably rely on the false representations or omissions of defendants and were induced to enroll and participate in the Allied Health Programs, including incurring substantial debt and financial obligations and foregoing other educational, employment, and family opportunities to do so.

35



142. Plaintiffs were directly and proximately harmed by their reasonable reliance on defendants' fraudulent representations and omissions and suffered damages as a result.

143. The fraudulent material representations and omissions by Miami-Jacobs were directed, approved, and/or continued by Delta and Gryphon and/or made with their knowledge and acquiescence at all relevant times.

144. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation, ownership, and responsibility with Delta and Gryphon that its separate status as a corporation has ceased to exist.

145. Because of defendants' fraud, which was conscious, deliberate, willful, intentional, and malicious and which consciously disregarded the rights of plaintiffs and which defendants knew has a substantial likelihood causing significant harm, plaintiffs are entitled to judgment for punitive damages, reasonable attorney fees, and costs.

## Count III - Breach of Contract

146. Plaintiffs incorporate the foregoing  as if fully rewritten.

147. Defendants contracted with plaintiffs to provide complete and reasonable education and training in the identified Allied Health fields in exchange for plaintiffs' successful completion of the required course of study and payment of tuition.

36



148. Plaintiffs paid the tuition, attended classes, clinical work, and meetings, participated and succeeded in their assignments, and substantially met the requirements of their educational contract with Miami-Jacobs.

149. Defendants failed to substantially comply or complete their contractual obligations, express and implied, oral and/or written, thereby breaching their contracts with plaintiffs.

150. Defendants' breach of the contracts with plaintiffs proximately resulted in damages to plaintiffs including but not limited to compensation for their tuition, loss of earning potential because of the inability to obtain employment in their chosen allied health field, loss of actual wages, costs of attending a new school or program for re-training or different training, and any other compensatory and consequential damages and costs incurred.

151. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation, ownership, and responsibility with Delta and Gryphon that its separate status as a corporation has ceased to exist.

152. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because they have participated in, directed, and benefitted from the scheme or enterprise with Miami-Jacobs.

37



### Count IV - RICO Violations

145.    Plaintiffs incorporate the foregoing as if fully rewritten.

146.    The Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§1961-1969 provides for a private civil action with remedies for violation of its substantive provisions in 18 U.S.C. §1964.

147.    RICO defines "racketeering activity" as including but not limited to specified acts chargeable under state law, those indictable under several federal criminal statutes, specifically including but not limited to mail fraud, wire fraud, and a several other frauds and offenses.  18 U.S.C. §1961.

148.    18 U.S.C. §1962 prohibits the use of income derived from a pattern of racketeering activity to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce, the acquisition or maintenance of an interest in an enterprise through a pattern of racketeering activity, conducting or participating in the conduct of an enterprise through a pattern of racketeering activity, and, conspiring to violate any of these provisions.

149.    Any person injured in his business or property by reason of a violation of a section of 18 U.S.C. §1962 may sue for that injury and damage and shall recover treble the damages he sustained, the costs of his or her suit, and his or her reasonable attorney fee as provided by 18 U.S.C. §1964.

38



150. Plaintiffs aver that defendants have engaged in a pattern and practice of racketeering activity predicated on acts of mail fraud and/or wire fraud as defined by 18 U.S.C. 1341 and 1343, by utilizing mail and wire services including but not limited to newspapers, direct mail solicitation and communication, advertising, internet promotion, email communication, cell and wire telephone communication, radio communication, and television communications to make, continue, spread, and assert false statements and misrepresentation material to inducing plaintiffs to enroll and to continue in defendants' School and Allied Health Programs, and by engaging in a scheme and conspiracy to do so.

151. Defendants have also utilized wire and mail services to coordinate, communicate, organize, direct, manage, fund, and otherwise further their scheme and enterprise used in committing and continuing the predicate acts of fraud.

152. By engaging in such wire and mail fraud, defendants have used income derived from a pattern and practice of racketeering activity in acquiring, establishing, maintaining, and/or conducting or participating in an interstate enterprise, the Miami-Jacobs/Delta/Gryphon organization and income derived therefrom, including defrauding students and the federal government into paying tuition, fees, falsely claimed expenses, and student loans to their detriment and to the benefit of defendants.

39



153.   Plaintiffs have been injured in their business and property due to defendants' acts in that they have incurred massive debt they are unable to reasonably repay, they are unable to reasonably obtain employment in the career fields or with the degrees they were induced to obtain from defendants, they are unable to pass needed or recommended certification or license examinations to obtain or better their employment so as to service their student loan debt, and they have foregone other opportunities in reliance on defendants' fraud.

154.   Plaintiffs' damages include the loss of reasonably anticipated income or wages, the costs of attending defendants' School and Allied Health Program(s), the interest accumulated and continuing to accrue on their student loans, the loss of alternative employment for which they could have obtained education or training in the alternative to defendants' programs, and the loss of experience, job seniority, and benefits that would have reasonably accrued to them, both past and for a reasonably foreseeable time in future.

155.   As a consequence, plaintiffs have sustained damage from defendants' pattern of racketeering activities, are entitled to recovery of their compensatory and consequential damages,  treble damages pursuant to statute, and the recovery of their reasonable attorney fees incurred.

### Count V - Ohio Pattern of Corrupt Activity



156. Plaintiffs incorporate any and all the foregoing statements and allegations as if fully rewritten herein.

157. R.C. §2923.31, et seq., is Ohio's Pattern of Corrupt Activity Act.

158. Defendants have through their combined scheme or enterprise conducted acts specified in R.C. §2923.31 and §2923.32 as corrupt acts, including the mail and wire fraud activities identified above.

159. Defendants have engaged in these activities on more than two occasions and indeed, with respect to hundreds of students, including the plaintiffs, and have obtained money and profits from these corrupt and fraudulent activities while plaintiffs have been harmed both economically and non-economically as set forth above.

160. The enterprise among the defendants exists separately from the corrupt and fraudulent activity conducted by the enterprise.

161. The Ohio Pattern of Corrupt Activity Act creates civil remedies for private parties that includes the availability of injunctive relief, damages, treble damages, and the recovery of attorney fees, all of which plaintiffs claim and are entitled to receive.

### Count V - False Claims Act/Qui Tam

162. Plaintiffs incorporate the foregoing as if fully rewritten.

163. Qui tam relators, Samantha Brumley, Haley Deck, and Gevena Milbry, bring this action on behalf of themselves and on behalf of the United States of America, to

41



recover damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., against defendants.

164. The facts and circumstances of defendants' violations of the False Claims Act have not been published or disclosed in any hearing, report, or media.

165. Relators are the original source of information on which this claim is based as phrased in the False Claims Act, and she/they provided disclosure of the allegations of this complaint to the United States prior to filing.

166. Defendants controlled the submission of financial aid applications for or on behalf of the School's students, including relators and plaintiffs, as well as the disbursement, application, return, and retention of unused student financial aid monies to government subsidized lenders.

167. Defendants knowingly submitted to the federal government fraudulent claims for payment or approval by submitting on behalf of students, including plaintiffs, false and/or unsubstantiated costs in order to obtain additional Title IV financial aid attributed to the debt obligations of plaintiffs, without the knowledge of plaintiffs. This false information is reflected on a "GFAS Tentative Budget Worksheet" prepared by Miami-Jacobs for each plaintiff/student.

168. By making these false representations to the federal government, defendants were able to obtain loans in the names of the plaintiffs in higher amounts, thereby

42



G  R  E  E  N
&
G  R  E  E  N
L  A  W  Y  E  R  S

benefitting defendants financially, while increasing the students' debt loads without their knowledge and at no cost or repercussion to the School.

169.    Defendants have also falsely certified to the government Miami-Jacobs' compliance with their Program Participation Agreement and applicable federal regulations as stated in this complaint and incorporated by reference.

170.    Defendants have also engaged in promissory fraud by obtaining contracts with students, including plaintiffs, through false and misleading statements or material omissions, and then submitting to the federal government claims and requests for student loan monies and/or grants based upon such fraudulently induced enrollment contracts, as stated in this complaint and incorporated be reference.

171.    Part of this fraud also includes the enrollment and retention of students in the Allied Health Program who failed to meet minimum standards and whom Miami-Jacobs knows or has reason to know will be unable to benefit from the education for which federal Title IV financial aid money is borrowed.

172.    Defendants have benefitted so much from their scheme to obtain the maximum amount of Title IV financial aid that Miami-Jacobs has demanded some students pay a portion of their tuition with private money not provided by Title IV funds because "all of [Miami-Jacobs'] money cannot come from financial aid" even though the students in question were otherwise awarded Title IV financial aid sufficient to pay

43



their tuition for the term. If the student was unable or refused to pay the money privately, an alleged "scholarship" was made available and applied to the student's account that changed the Title IV calculation. See, 34 C.F.R. §§668.14(b)(16); 668.28(a).

173. Further, defendants have at times represented that they are returning financial aid monies to lenders, including the federal government, which is not received by the lender, was not received by the students/borrowers, and was, upon information and belief, not returned by defendants.

174. Defendants Delta and Gryphon conspired with, directed, and enabled Miami-Jacobs to commit the fraud on the federal government as described above, and further received the benefit of the fraud by receiving increased Title IV financial aid funds.

175. Such actions by defendants were knowing and are violations of the False Claim Act, 31 U.S.C. §3729 and its supporting regulations, and subject defendants to a civil penalty per violation and double damages, as specified by statute.

176. Violations of 31 U.S.C. §3729 are subject to civil remedy under 31 U.S.C. §§3730-3731 and private persons bringing such actions are entitled to statutorily-specified recovery upon success of the claim, whether brought by the United States Attorney General or privately.

### Count VI - Negligent Misrepresentation

44



177. Plaintiffs incorporate the foregoing as if fully rewritten.

178. Plaintiffs reasonably and detrimentally relied on one or more false material representations or omissions made by defendants as described above.

179. Plaintiffs suffered economic and non-economic injury as described above as a proximate result of their reasonable reliance.

180. Plaintiffs' reasonable reliance was such that the injury they suffered inured to the benefit of defendants.

181. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation and ownership with Delta and Gryphon that its separate status as a corporation has ceased to exist.

### Count VII - Promissory Estoppel

182. Plaintiffs incorporate the foregoing as if fully rewritten.

183. Defendants made promises to plaintiffs including but not limited to: (a) that upon successful completion of the prescribed course of study, they should reasonably expect to be adequately trained and educated in their career field; (b) to be able to gain employment in their selected allied health career field; (c) to be prepared to continue with additional education, including transfer of their course credits to four year schools; and (d) to be adequately prepared to take and pass required, recommended, or available licensing and certification exams in their career field.

45



184. Defendants' promises were definite and clear.

185. Defendants reasonably expected to induce action of a definite and substantial character on the part of plaintiffs by their promises and representations.

186. Plaintiffs acted in reasonable reliance on the defendants' promises identified above, by (a) applying for admission; (b) enrolling in the School; (c) applying for and obtaining student loans and/or financial aid for which they were obligated; (d) paying tuition; (d) attending classes and clinical training; and (e) continuing their studies and other activities in the manner expected and required by the defendants.

187. Defendants failed to keep their promises to the detriment of plaintiffs.

188. Defendants' promises must be enforced if justice is to be served and injustice avoided.

189. Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation and ownership with Delta and Gryphon that its separate status as a corporation has ceased to exist.

## Count VIII - Equitable Estoppel

190. Plaintiffs incorporate any and all the foregoing as if fully rewritten herein.

191. Defendants, by representations, admissions, and silence in the presence of a duty to speak, intentionally and/or negligently induced plaintiffs and class members to believe facts material to them and the transactions at hand.



G R E E N
G R E E N
L A W Y E R S

192.    Plaintiffs reasonably and justifiably relied on and acted in belief of those representations or omissions of material fact.

193.    Plaintiffs will be prejudiced or damaged if the defendants are permitted to assert any statute of limitations defenses when their fraud and misrepresentations were purposefully and actively concealed from plaintiffs.

194.    Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation and ownership with Delta and Gryphon that its separate status as a corporation has ceased to exist.

### Count IX - Unjust Enrichment

195.    Plaintiffs incorporate the foregoing as if fully rewritten.

196.    Defendants have received benefits from plaintiffs in the form of tuition, fees, federal financial aid monies, private financial aid monies, grants, and payments for books, supplies, equipment, and computers, as well as loan proceeds purportedly for student "room and board", "transportation", and "personal" costs, among others that were retained by defendants while adding to plaintiffs' loan obligations.

197.    It is inequitable to allow defendants to retain these benefits.

198.    Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation and ownership with Delta and Gryphon that its separate status as a corporation has ceased to exist.

47



G R E E N
&
G R E E N
L A W Y E R S

## Count X - Ohio Deceptive Trade Practices Act

199. Plaintiffs incorporate the foregoing as if fully rewritten.

200. Ohio's Deceptive Trade Practices Act, R.C. §4165.01 et seq., applies to the acts of defendants and transactions between plaintiffs and defendants as alleged above.

201. Defendants have violated multiple provisions of R.C. §4165.02 by their acts and concealment as described herein including:

   (a) Causing a likelihood of confusion or misunderstanding as to the approval or certification of its programs or services;

   (b) Causing a likelihood of confusion or misunderstanding as to their affiliation, connection, or association with or certification by, another;

   © Representing that their programs and/or services have approval, characteristics, uses, benefits, or quantities that they do not have;

   (d) Representing that their programs and/or services are of a particular standard, quality, or grade, when they are not;

   (e) Advertising programs or services with the intent not to sell or provide them as advertised; and

   (f) Listing in directory services and doing business under a fictitious business name that is not registered as a trade name with or reported to the Ohio Secretary of State as a fictitious name and when the business is in fact owned and operated by an undisclosed, out of state, person or entity.

202. As a proximate result of defendants' violations of the Ohio Deceptive Trade Practices Act described above, plaintiffs were damaged and are entitled to recover their compensatory damages and attorney fees as provided by R.C. §4165.03.

48



203.    Defendants Delta and Gryphon are equally liable with Miami-Jacobs because Miami-Jacobs shares such a unity of interest, operation and ownership with Delta and Gryphon that its separate status as a corporation has ceased to exist.

### Count XI - Civil Conspiracy

204.    Plaintiffs incorporate the foregoing as if fully rewritten.

205.    Since at least 2004, defendants Delta and/or Gryphon have actively participated in the ownership, operation, and management of defendant Miami-Jacobs.

206.    During this period, agents, officers, and employees of Delta and Gryphon along with Miami-Jacobs engaged in concerted action to develop and continue their schemes of fraud committed upon plaintiffs described above.

207.    Delta in particular became involved in the direct operation of key business aspects of Miami-Jacobs' operation.

208.    During this period defendants combined efforts and activities to accomplish unlawful purposes and results, including the continuation of the frauds described above and the resulting stream of Title IV funding to Miami-Jacobs and the other defendants, independent of the commission of fraud, consumer violations, breaches, and other unlawful acts as alleged.

49



209.    Plaintiffs were proximately harmed by defendants' conspiracy and are entitled to compensatory and punitive damages as a result.

### Count XII - Public Policy Tort

210.    Plaintiffs incorporate the foregoing as if fully rewritten.

211.    Defendants' conduct in retaliating against students who inquire about, question, or challenge the School's operation, programs, clinical site availability, or other policies, or who seek legal advice or speak to the media, violates public policy.

212.    Ohio and the United States favor protection of "whistleblowers" as evidenced by various state and federal statutes and court decisions reflecting that policy. None of those statutes is directly applicable to students enrolled in and attending a proprietary career college such as the School.

213.    Plaintiffs have been damaged by the defendants' pattern and practice of intimidation, retribution, inconsistent application of school policies, and selective and retaliatory discipline, including forced involuntary withdrawals from the Allied Health Programs in violation of recognized public policy, and are therefore entitled to recover compensatory and punitive damages.

WHEREFORE, Plaintiffs, including all eligible class members, demand judgment in their favor and against defendants as follows:

50



1. For an order certifying that this action be maintained as a class action for and on behalf of those persons described as class and/or sub-class members;

2. For judgment in favor of plaintiffs and class members for compensatory damages, consequential damages, and incidental damages in an amount to be determined at trial and anticipated to exceed $ 4,000,000.00;

3. For judgment in favor of plaintiffs and class members for statutory damages pursuant to the Ohio Consumer Sales Practices Act, the federal RICO Act, the Ohio Pattern of Corrupt Activity Act; the federal False Claims Act, and for exemplary damages and punitive damages pursuant to R.C. §2315.21, in an amount to be determined at trial and anticipated to exceed $10,000,000.00;

4. For judgment in favor of plaintiffs and class members for injunctive relief and declaratory relief as appropriate;

5. For judgment and award in favor of plaintiffs and class members for reasonable attorney fees and expenses as determined by the court;

6. For judgment for pre- and post-judgment interest at the Ohio statutory rate;

7. For judgment for plaintiffs' and class members' costs of this action; and

6. For such further relief this court finds just and appropriate.



Respectfully submitted,

ERIN B. MOORE
Bar Number 0061638
PETER F. von MEISTER
Bar Number 0024458
Attorneys for Plaintiffs
Green & Green, Lawyers
800 Performance Place
109 North Main Street
Dayton, Ohio 45402-1290
Tel:    937.224.3333
Email:  ebmoore@green-law.com
        pfvmeister@green-law.com
Fax:    937.224.4311

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Erin B. Moore

## CERTIFICATE OF SERVICE

This certifies that a true and accurate copy has been served upon the United States Attorney, Carter M. Stewart, Esq., at the U.S. Attorney's Office, Federal Building, 200 W. Second Street, Suite 600, Dayton, Ohio 45402, by hand delivery this 28th day of February, 2012.

Erin B. Moore

52

GREEN
&
GREEN
LAWYERS